David Gerald ARNOLD, Appellant

v.

The STATE of Texas, Appellee.

No. 14–05–00141–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

June 14, 2007.

Lucinda Kay Marshall, Houston, TX, for appellants.

Shirley Cornelius, Houston, TX, for appellees.

Panel consists of Justices FROST, SEYMORE, and GUZMAN.

## OPINION

EVA M. GUZMAN, Justice.

A jury convicted appellant David Gerald Arnold of murdering Kenneth Wimbley and assessed punishment at ten years' confinement in the Institutional Division of the Texas Department of Criminal Justice. On appeal, he challenges his conviction and sentence on the grounds that the trial court improperly refused his requests for a manslaughter instruction and for instructions limiting the use of extraneous-offense evidence, failed to instruct the jury to disregard improper arguments, and abused its discretion by refusing to allow defense counsel to conduct a second redirect examination of appellant and by selecting incomplete or inappropriate material to be read to the jury in response to its requests. Appellant also presents contingent requests for abatement and remand. We overrule each of appellant's issues, deny his requests, and affirm the conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Although he has been married to someone else since 1998, appellant had been romantically involved with Erica Woodard "on and off" since approximately 1993 and they had a son who resided with Woodard. According to Woodard, she ended her relationship with appellant about six months before the events at issue, but appellant visited their son two or three times a week. Woodard also had been in a romantic relationship with the decedent, Kenneth Wimbley, since early 2003, and they were engaged to be married in January 2004.

Appellant and Woodard planned to have dinner together on February 17, 2004, but Woodard "blew it off." She and her son instead met Wimbley for dinner and returned to her apartment at approximately 9:15 p.m. Woodard was preparing to bathe her son when appellant knocked on her door. After she let him in, he asked where she had been, but she refused to tell him. At about this time, Wimbley telephoned Woodard and told her that he was coming over, and Woodard repeated this information to appellant. Appellant then finished bathing his son, put him to bed, and remained in the kitchen talking with Wood-

ard until Wimbley knocked at Woodard's door.

Woodard testified that she did not see a gun before the shooting, but stated that appellant yelled at her and pushed her while she was trying to get to the door. She opened the door four to six inches, but opened it no further because it was locked with a chain lock and a security latch. Woodard testified that she asked Wimbley to wait in the car until appellant left, but he would not leave. According to Woodard, she had been speaking with Wimbley for five to seven minutes when she heard a gunshot. She testified that she heard Wimbley say he had been shot and saw him grab his chest before she closed the door to unlock the security latch and chain. Woodard stated that she took her cordless phone and followed Wimbley, who had run to the other side of a breezeway, while appellant left in another direction. Woodard found Wimbley on the ground bleeding from the neck. According to Woodard, Wimbley had his cell phone. She did not know if he had been trying to call someone, but she took his phone and called 911 on her own cordless phone.[1]

Appellant testified that he retrieved a gun from Woodard's bedroom after Wimbley arrived at the apartment and began yelling and banging at the door. He further testified that Woodard tried to take the gun from him and to stay between him and the door. According to appellant, Wimbley kept asking Woodard, "Are you okay? What did that MF do to you? Are you okay?" Appellant testified that he was afraid that Wimbley would cause him serious bodily injury, that he believed his child's life could be in danger, and that he just wanted to leave. He stated that he fired one shot while Wimbley was holding the door handle and the door immediately closed as if Wimbley fell back when he was shot. According to appellant, he and Woodard then went into the living room and had a conversation before she grabbed a telephone and they both left the apartment. Appellant went to his vehicle and drove away while Woodard went in a different direction on foot. Appellant denied that he ever chased Wimbley or armed himself and looked for Wimbley outside of the apartment. On cross-examination he admitted that he never attempted to call for help, either before or after shooting Wimbley, and that after he learned that Wimbley was coming to the apartment, he did not attempt to leave before Wimbley arrived. On redirect, he was asked whether it was his intention to kill Wimbley or to keep himself or his son from getting hurt. He responded, "To keep myself from getting hurt, and my son." He also admitted that Wimbley did not display a weapon.

Rex Evans, a deputy for the Harris County Sheriff's Office, was the first of the emergency personnel to arrive at the scene. He found Wimbley semi-conscious next to a staircase in a breezeway about fifty feet from Woodard's apartment. Evans saw that Wimbley had been shot in the neck and spoke to him to help him stay conscious. According to Evans, Wimbley told him that David Arnold shot him.

After paramedics arrived, Evans spoke with a juvenile, C.L., who had been standing close to Evans as he knelt over Wim-

---

1. In the written statement Woodard gave police that night, Woodard stated that the shooting occurred entirely outside of her apartment and she learned what had happened only after she heard a noise outside. She did not mention that the shooting occurred· at her door. At trial, Woodard said that she was not in her "right mind" at the time she gave that statement, but was telling the truth in court. She also admitted that she was still seeing appellant, and that she gave the Grand Jury a third version of events in which the shooting took place inside her apartment.

bley. Evans testified that C.L. was crying and told him, "Yeah, they were running around . . . and David shot him."

Thirteen-year-old C.L. testified that he saw appellant bringing flowers to Woodard shortly before 4:00 p.m. on the afternoon of the shooting. He further testified that as he was taking out the trash at approximately 10:05 p.m., he saw Wimbley going up some stairs to the third floor balcony.[2] C.L. said that he also saw a black man on the third floor with a gun, and he saw Wimbley running back down the stairs. According to C.L., he continued to the dumpster and after he threw in the trash, he heard appellant yell, "Here he is." C.L. testified that after appellant ran upstairs, C.L. ran to try "to get away from them." C.L. stated that just before he reached a breezeway, Wimbley ran down the stairs at the end of the breezeway and said to C.L., "Stay back because I don't want you to get hurt." C.L. testified that he stopped, but when Wimbley had gone into the breezeway "a little," C.L. heard a shot, followed seconds later by a second shot. C.L. went into the breezeway to see if Wimbley had been shot and found him lying on the ground; C.L. testified that he also saw appellant running away down the breezeway while tucking a gun into his pants. C.L. testified that Wimbley yelled to him to get Woodard, but C.L. saw that she was already coming down the stairs. He further testified that after appellant ran, he saw a black male run down the stairs from the third floor and take the same path taken by appellant. C.L. went into his apartment and called 911.[3] After reviewing his police statement, C.L. admitted that he did not always identify appel-

lant by name in the statement, but sometimes instead said "a black man."

Sherman Perry testified that he had a long telephone conversation with Wimbley during these events. According to Perry, the call began at around 9:30 p.m. when Wimbley was home packing to spend the night with Woodard. Perry said that later in the conversation, Wimbley said that appellant had a gun and was chasing him. According to Perry, Wimbley was breathing hard and was frightened. Perry testified that he heard two gunshots and heard Wimbley say, "I was hit." He further testified that he tried to keep Wimbley talking after that, and Wimbley said "I'm getting cold." Perry said that at some point, another person picked up Wimbley's cell phone, but Perry stayed on the phone while he traveled to the scene. Perry did not hear appellant or Woodard ask Wimbley to leave.

Detective William Vallero testified that blood evidence was found only around the location where Wimbley was found in the breezeway just under the foot of the stairs. Dr. Stephen Wilson, Assistant Medical Examiner, testified that stippling around the gunshot wound and on Wimbley's face was caused when gunpowder residue penetrated Wimbley's skin. As Dr. Wilson explained, this indicates that the gun used in the shooting was as close as five inches or as far away as twenty-four or thirty six inches from Wimbley at the time he was shot.

Appellant voluntarily surrendered himself to authorities after retaining counsel and was tried for murder in January 2005. Before trial, the trial court denied appellant's motion to exclude extraneous-offense evidence that he had intimidated Wimbley

---

2. C.L. knew Wimbley because he came to most of C.L.'s football practices.

3. Conflicting evidence was offered regarding whether Woodard lived on the first or the second floor of Building No. 8 of the apartment complex.

with a gun three months before the murder. Over defense counsel's objections, Quinton Goodwin testified that three months before the shooting, he drove Wimbley to the apartment where Woodard then lived and saw appellant leave Woodard's apartment and put the empty packaging from a television set in his truck. According to Goodwin, Wimbley approached appellant and spoke to him. Goodwin testified that appellant then opened the door of his vehicle, removed a black semi-automatic handgun, and continued the conversation while holding the gun at his side in plain view. Goodwin said that Wimbley raised his hands with his palms facing appellant and took about three steps back. According to Goodwin, Wimbley and appellant continued to speak for about thirty seconds before Wimbley lowered his hands; the two men then spoke for another thirty seconds before Wimbley returned to Goodwin's car and left with him. Goodwin said he could not hear what either man said during the conversation.

The jury charge included charges of murder and criminally negligent homicide and instructions on self-defense, but the trial court denied appellant's request to include a charge for manslaughter. During the jury's deliberations after each phase of trial, the jury asked to hear portions of testimony, and the trial court overruled appellant's objections to the testimony read to the jury.

The jury found appellant guilty of murder and after an initial deadlock assessed punishment at ten years' confinement in the Institutional Division of the Texas Department of Criminal Justice. This appeal ensued.

**4.** An *Allen* charge is given to instruct a deadlocked jury to continue deliberating. *See Al-*

## II. ISSUES PRESENTED

Appellant presents five issues for review. In his first two issues, he challenges his murder conviction on the grounds that the trial court improperly refused to charge the jury on the lesser-included offense of manslaughter and failed to instruct the jury to limit its consideration of extraneous-offense evidence. In his third issue, he contends the trial court committed reversible error by failing to instruct the jury to disregard the State's improper closing arguments. Appellant argues in his fourth issue that the trial court abused its discretion in selecting testimony to read to the jury in response to its requests. Finally, appellant contends in his fifth issue that the trial court abused its discretion by refusing to allow defense counsel to question him a third time during the guilt/innocence phase of trial.

■ Appellant also presents two contingent requests in which he asks that if we overrule each of the issues presented and deny his request for a new trial, then we (a) abate the appeal, remand the case to the trial court, order a hearing permitting appellant to make an offer of proof, and direct the trial court to forward the offer of proof to this court, or (b) remand the case and direct the trial court to supplement the record with a copy of the *Allen*[4] charge given at trial.

## III. ANALYSIS

### A. Requested Manslaughter Charge

■■ In his first issue, appellant contends the trial court erred by denying his requested jury charge on manslaughter as a lesser-included offense. We employ a two-part test to determine whether a charge on a lesser-included offense was required. *Feldman v. State,* 71 S.W.3d

*len v. United States,* 164 U.S. 492, 501, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896).

738, 750 (Tex.Crim.App.2002). First, we must decide whether the offense is actually a lesser-included offense of the offense charged. *Id.* Second, we must conclude there is some evidence in the record that would permit a rational jury to find the defendant guilty only of the lesser offense. *Id.* A lesser-included offense is not required solely because "the jury may disbelieve crucial evidence pertaining to the greater offense, but rather, there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted." *Hampton v. State,* 109 S.W.3d 437, 441 (Tex.Crim.App.2003) (en banc) (citing *Skinner v. State,* 956 S.W.2d 532, 543 (Tex. Crim.App.1997)).

■ There is no question here that the first prong of the test is satisfied: it is well-established that manslaughter is a lesser-included offense of murder. *Girdy v. State,* 213 S.W.3d 315, 318–19 (Tex. Crim.App.2006); *Moore v. State,* 969 S.W.2d 4, 9 (Tex.Crim.App.1998) (en banc). The only difference between the two offenses is the mental state required. *Ross v. State,* 861 S.W.2d 870, 875 (Tex.Crim. App.1992) (en banc). Murder is statutorily defined as intentionally or knowingly causing the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2006). A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). In contrast, manslaughter is defined as recklessly causing the death of an individual. *Id.* § 19.04(a). A person acts recklessly with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. *Id.* § 6.03(c).

■ Applying these definitions, the second prong of the test is satisfied if there is some evidence from which a rational jury could find that appellant consciously disregarded the substantial and unjustifiable risk that his conduct would cause Wimbley's death, rather than finding that (1) it was appellant's conscious objective or desire to cause Wimbley's death, or (2) appellant was aware that his conduct was reasonably certain to cause Wimbley's death. *See Feldman,* 71 S.W.3d at 750–51. Appellant argues that this test is satisfied because his testimony indicated that he did not intend to kill Wimbley:

Defense: At what point did you decide to fire the weapon?

Appellant: Erica was standing between the ajarred [sic] door and myself, and he was still trying to get in. My back was up against the wall in the foyer. He grabbed the door handle and pulled it in to push the door ajar with more force. At the time when he had closed the door, I was reaching for the flip bar latch to open the door to get out of there, but I didn't get a chance to open the flip bar latch because as soon as I reached up for it, I had the firearm in my left hand. And as soon as I reached up for it, the door flung open and I felt—and the gun went off, and the door closed.

Appellant argues that testimony such as this creates an inference that the gun discharged accidentally. But this argument relies on isolated statements taken out of context and gives "meaning to appellant's statement[s] that appellant did not." *See Godsey v. State,* 719 S.W.2d 578, 584 (Tex. Crim.App.1986) (en banc). Fragments of

testimony "cannot be plucked out of the record and examined in a vacuum." *Id.* Here, any inference that the gun discharged accidentally is negated by appellant's testimony on cross-examination describing his state of mind:

State: And your testimony is you jumped and the gun went off, correct?

Appellant: Yes, ma'am—yes, sir.

State: Now, did you intentionally or knowingly fire that gun at Ken Wimbley?

Appellant: Yes, sir.

State: So, it wasn't an accident that you shot him, correct?

Appellant: No, sir.

State: So, when you say you jumped and the gun went off, that isn't exactly right, is it?

Appellant: Yes, sir, that's right.

State: Well, you jumped. Did you pull the trigger when you jumped?

Appellant: Yes, sir.

State: Were you aiming at him when you jumped?

Appellant: No, sir.

State: So, did you intend to hit him?

Appellant: No, sir.

State: So, you intentionally fired the gun or was it an accident when you jumped?

Defense: Objection, Your Honor. Asked and answered.

Court: Overruled.

Appellant: Repeat the question.

State: Did you intentionally fire that gun or did it accidentally go off when you jumped?

Appellant: I intentionally fired the gun.

State: But your testimony is you did not intentionally fire it at Ken Wimbley; is that right?

Appellant: Yes, I did.

State: So, you shot him and you meant to do it, right?

Appellant: Yes, sir.

Appellant also testified that he knew the gun was loaded, and that the gun had a "double safety that kept you from pulling the trigger unless you took both of them off." According to appellant, "[o]ne was a flip bar on the side, and the other was a palm safety where you had to hold the gun and take the other one off to be able to fire the firearm."

■ In sum, the evidence does not raise the issue of manslaughter. To raise this issue, there must be evidence of a lack of intent to kill and evidence that the accused acted recklessly while ignoring a known risk. *Munoz v. State*, 932 S.W.2d 242, 245 (Tex.App.-Texarkana 1996, no pet.). The appellant's denial that he intended to kill the victim does not, of itself, raise the issue of manslaughter. *Id.* To the contrary, when "a deadly weapon is used in [a] deadly manner, the inference is almost conclusive that [the appellant] intended to kill...." *Godsey*, 719 S.W.2d at 581 (quoting *Hatton v. State*, 31 Tex.Crim. 586, 21 S.W. 679 (1893)). In the absence of other evidence, the jury may presume intent to kill from the use of a deadly weapon. *Munoz*, 932 S.W.2d at 245. Thus, courts have typically found that a manslaughter instruction was required based on some evidence that the gun discharged accidentally or that the defendant only intended to frighten the complainant. *See, e. g., Trujillo v. State*, 227 S.W.3d 164 (Tex.App.-Houston [1st Dist.], 2006, pet. filed) (defendant indicted for murder was charged and convicted of manslaughter based on evidence that he was brandishing a loaded gun to frighten pursuers when the gun accidentally discharged). Given the state of the entire record, appellant's isolated statements that he was not aiming at Wimbley and did not intend to kill him

do not constitute evidence upon which a jury could rationally find that appellant's actions were merely reckless. *See Mathis v. State,* 67 S.W.3d 918, 926 (Tex.Crim. App.2002). We therefore overrule appellant's first issue.

### B. Limiting Instructions on the Use of Extraneous–Offense Evidence

■ In his second issue, appellant contends the trial court erred during the presentation of evidence and in its submission of the jury charge by failing to instruct the jury to limit the purposes for which it considered Quinton Goodwin's extraneous-offense evidence. Approximately three months before trial, appellant filed a written objection to the admission of extraneous-offense evidence and requested limiting instructions if the trial court admitted the evidence. Although appellant moved to exclude this evidence at trial, he did not request a limiting instruction when the evidence was admitted or when the jury was charged.

■ The Court of Criminal Appeals has consistently held that a party opposing the admission or unrestricted use of evidence has the burden of objecting and requesting a limiting instruction when the evidence is introduced. *See, e.g., Hammock v. State,* 46 S.W.3d 889, 894 (Tex. Crim.App.2001); *Garcia v. State,* 887 S.W.2d 862, 877 (Tex.Crim.App.1994) (en banc). If a limiting instruction is not requested when the evidence is introduced, then it is admitted for all purposes. *Garcia,* 887 S.W.2d at 877. Because appellant did not request a limiting instruction when Goodwin testified, his testimony was admitted for all purposes. Consequently, there were no grounds for including a limiting instruction in the jury charge.

*See Hammock,* 46 S.W.3d at 895. Accordingly, we overrule appellant's second issue.

### C. Improper Argument

In his third issue, appellant contends the trial court erred "by not correcting instances of improper argument" by the State. The first alleged instance occurred during the State's closing argument in the guilt/innocence phase of trial. In support of its theory that appellant chased Wimbley as described by C.L. and Perry, the State argued that if appellant shot Wimbley "between that door with a person in between them, that stippling would have disbursed [sic] before it hit him." The trial court overruled defense counsel's objection that the State was arguing outside the record.

■ Argument to the jury may properly include reasonable deductions from the evidence. *See Hughes v. State,* 878 S.W.2d 142, 157–58 (Tex.Crim.App. 1992) (en banc); *Gaddis v. State,* 753 S.W.2d 396, 398 (Tex.Crim.App.1988); *Carter v. State,* 614 S.W.2d 821, 823 (Tex. Crim.App.1981). Here, a medical examiner testified that the stippling was caused by gun powder residue that penetrated the skin, and established that the gun was no more than thirty-six inches from Wimbley when he was shot. According to Woodard's testimony, appellant fired the gun, propelling the bullet (and presumably, gun powder residue) through an opening only four to six inches wide at a time when the space was at least partially blocked by Woodard. But according to the autopsy report, stippling was found on Wimbley's neck and face. The stippling on his face covered "an eight by six area."[5] We therefore conclude the State reasonably deduced that if the shooting occurred as the defense contends, then powder would

5. This description is found in the autopsy report.

have dispersed over Woodard, the door, and the door frame, leaving an area of stippling on Wimbley's body smaller than the four-to-six-inch opening of the door.

Appellant also complains of the following italicized statements during the State's rebuttal argument in the punishment phase of trial:

State: I want to address a couple of issues that Defense counsel brought up just to avoid some confusion. If you assess, which I don't think is appropriate, if you were to assess community supervision, you don't have— you just determine the number of years. The Judge determines what those terms and conditions are. So, you have no guarantee as to what the Judge would assess in that condition.

Also, in America, we don't have a debtor's prison. And that's the same thing for somebody on community supervision. If they don't pay their fees, if they don't pay child support, if they don't pay to support a dependent, the State can't revoke them just for financial reasons. So, even if the Judge were to assess that *and he doesn't pay, there is nothing the State can do about it.*

Defense: Objection, Your Honor. Improper argument.

Court: Ladies and gentlemen of the jury, the Court can order certain fees to be paid as well as certain restitution to be paid. If the person charged does not pay those, *the State has to show the ability to pay before the Court can do anything.*

Defense Thank you, Your Honor. May we ask that the jury disregard the State's statement?

Court: The jury has been instructed. Overruled.

Defense: Thank you.

▮▮▮▮ Both explanations of the law in the above exchange are incorrect: when the State seeks to revoke a defendant's community supervision for failure to make court-ordered payments, the State bears the initial burden to prove that the failure to pay was intentional, and the defendant bears the burden to prove inability to pay. *See* TEX.CODE CRIM. PROC. ANN. art. 42.12 § 21(c) (Vernon 2006); *Stanfield v. State,* 718 S.W.2d 734, 737–38 (Tex.Crim.App. 1986) (en banc). Because this error is nonconstitutional, however, we will disregard it if it does not affect appellant's substantial rights. TEX.R.APP. P. 44.2(b).

▮▮▮▮ A substantial right is affected when the improper jury argument has a substantial and injurious effect or influence on the jury's verdict. *Simpson v. State,* 119 S.W.3d 262, 266 (Tex.Crim.App. 2003). To determine whether an improper jury argument is harmful, we consider (1) the severity of the misconduct or prejudicial effect, (2) any curative measures taken, and (3) the certainty of conviction or punishment assessed absent the misconduct. *Martinez v. State,* 17 S.W.3d 677, 692–93 (Tex.Crim.App.2000) (en banc).

▮▮▮ Appellant points out that the jury was initially deadlocked between those jurors who thought community supervision was appropriate and those that recommended imprisonment. Appellant argues that the erroneous statements of law likely broke the deadlock and caused the jury to sentence him to confinement. We disagree.

First, there is no evidence in the record to support a supposition that the jury believed appellant would not pay any court-ordered fees or debts. The uncontroverted evidence at trial established that although there is no court order directing him to support his child by Woodard, appellant voluntarily pays all of the child's

daycare expenses, all of his health insurance, and pays Woodard an additional two or three hundred dollars a month for any other expenses. Because the evidence is uncontroverted that appellant was willing and able to support his child without the necessity of a court order, the jury would have no reason to infer that appellant would be unwilling or unable to pay court-ordered fees or to support Wimbley's children if ordered to do so as a condition of probation. Consequently, we cannot say that the misstatement had a prejudicial effect.

Moreover, the improper statements of law were brief and addressed a tangential aspect of community supervision: that of revocation of community supervision for failure to pay fees or debts. In an effort to cure the State's misrepresentation of the law, the trial court attempted to instruct the jury on the governing law, and this curative instruction contained another misstatement. Appellant argues that, in effect, no curative instructions were given because the trial court's statement of the law was incorrect. But the law as stated by the trial court is more favorable to a probationer than the governing law. The trial court accurately stated that the State bears the initial burden of proof, but misstated the fact that must be proved. The State must first prove that the defendant intentionally violated a condition of community supervision; because inability to pay is an affirmative defense, the State need not prove ability to pay unless the defendant first raises that defense. In addition, appellant's ability to pay any court-ordered fees or child support was never called into question. Thus, even if the error were potentially prejudicial, the curative instructions, although incorrect, were sufficient to cure any prejudice.

■ Finally, it is unlikely that these misstatements caused the jury to sentence appellant to confinement rather than community supervision. The defense's key argument in favor of community supervision was that it would be better for appellant, the State, and Wimbley's survivors if appellant remained in the community to support Wimbley's children:

So, why then should you give him probation? Why? Well, I'm going to tell you why. Because if you send him to prison, there will be not only two children now without a father, not only four children now without support, but six. Six children. So, how then would society benefit from you placing David Arnold on community supervision? I'm going to tell you how.

You put him on community supervision and *you hold him responsible to Mr. Wimbley's children.* Because they don't have a father to support them now. *You make him support those children. You make him work for them,* whether it be to pay them monthly support, whether it be to make him start a college fund for them, the Judge has that discretion and he can do it. And he would be held responsible for *that.... Make him support the [sic] Wimbley's children.*

(emphasis added). As this excerpt illustrates, the defense primarily asked the jury to make appellant support Wimbley's children and spoke of community supervision as an incidental condition necessary to implement that "sentence." But as the State correctly pointed out, the jury does not have the power to impose such a requirement. To the contrary, the conditions of community supervision are determined by the trial court, not by the jury. Consequently, there is no reason to suppose that the jury's rejection of community supervision was based on the burden of proof at a hypothetical revocation hearing rather than on the knowledge that it had

no power to impose the conditions urged by the defense.

Based on our review of the record, we are persuaded that the misstatements of law by the State and the trial court did not have a substantial effect on appellant's rights, and did not have an injurious effect on the jury's assessment of punishment. We therefore overrule appellant's third issue.

### D.  Testimony Read to the Jury

In his fourth issue, appellant contends the trial court abused its discretion by selecting certain portions of testimony to be read to the jury in response to its requests. If jurors disagree about the testimony of any witness, the jury may apply to the trial court to "have read to them from the court reporter's notes that part of such witness testimony or the particular point in dispute, and no other...." TEX.CODE CRIM. PROC. ANN. art. 36.28 (Vernon 2006). After determining that jurors dispute a portion of testimony, the trial court must strike a balance between reading too much or too little testimony in response to the jury's request. *See, e.g., Jones v. State,* 706 S.W.2d 664, 668 (Tex. Crim.App.1986) (en banc) (holding that the trial court abused its discretion by failing to have cross-examination testimony related to the disputed issue read to the jury); *Pugh v. State,* 376 S.W.2d 760, 761–62 (Tex.Crim.App.1964) (holding that the trial court erred when, in response to the jury's request for testimony regarding the date and time of the incident, it caused the entirety of the arresting officer's testimony to be read). We review the trial court's rulings on the jury's request to review testimony for an abuse of discretion. *Jones,* 706 S.W.2d at 667.

Appellant first complains of the trial court's response to the following jury request:

Name of witness whose statement is subject to disagreement:

*David Arnold*

Lawyer questioning witness at time of statement:

*Charles Thompson (for the State)*

Statement in Dispute:

*"Did you knowingly and intentionally shoot Kenneth Wimbl[e]y?"*

*"Yes"*

In response, the trial court had the following testimony read to the jury:

> Question:  Now, did you intentionally and knowingly fire that gun at Ken Wimbley?
>
> Answer: Yes, sir.

Defense counsel objected to this selection on the grounds that this testimony is not responsive to the question asked by the jury and requested that the jury hear a longer portion of the transcript consisting largely of the excerpt quoted in our discussion of appellant's first issue. The trial court overruled the objection.

Because the statement in dispute is phrased in the second person and uses quotation marks for the question and answer, the trial court did not abuse its discretion in concluding that jurors disputed whether a specific question was asked and was answered in the affirmative. Given the jury's specific and limited request, there was no basis for the trial court to cause additional testimony to be read to the jury. To the contrary, the testimony selected by the trial court is the only question and answer responsive to the jury's request; thus, the material that was read to the jury appropriately consisted of "that part of such witness testimony or the particular point in dispute, *and no other* ...." *See* TEX.CODE CRIM. PROC. ANN. art. 36.28 (Vernon 2006) (emphasis added).

▮ Appellant next challenges the trial court's choice of material to be read to the jury in response to the following request:

Name of witness whose statement is subject to disagreement:

*[C.L.]*

Lawyer questioning witness at time of statement:

*Mrs. [Quinones] (Defense)*

Statement in Dispute:

*1) Statement of Ken telling him "there's going to be trouble" to "he turned the corner and I heard the shot"*

*—also—*

*2) Who did he see on [the] upper floors of building # 8*

Concerning the first question, the trial court informed the attorneys that it could not find the quoted portions, "There's going to be trouble["] and ["]he turned the corner." In response to the second question, the trial court ordered the following testimony by C.L. to be read to the jury:

Question: And you saw Mr. Wimbley on the third floor balcony; isn't that correct?

Answer: Yes, ma'am.

Question: Okay. And after you saw Mr. Wimbley, you saw another man, didn't you, [C.L.]?

Answer: Yes, ma'am.

Question: And you weren't able to identify who that man was?

Answer: No, ma'am.

Question: And he was also on the third floor, wasn't he?

Answer: Yes, ma'am.

Appellant contends that the trial court's selection of this testimony amounts to a comment on the evidence because the following testimony regarding the unidenti-

**6.** This testimony immediately preceded the question "[a]nd he was also on the third floor,

fied man was excised from this portion of C.L.'s testimony: [6]

Question: And, in fact, that man was carrying a gun, wasn't he?

Answer: Yes, ma'am.

Question: He was carrying a black and silver gun, wasn't he?

Answer: Yes, ma'am.

▮ We conclude that the trial court did not abuse its discretion by omitting this testimony because this material is not responsive to the jury's request. The jury requested C.L.'s testimony stating *who* he saw on the upper floors of the building, not *what* he saw. When the jury requests the reading of only a specific and limited portion of testimony, the trial court does not abuse its discretion by providing only the requested information. *See id.; Robison v. State*, 888 S.W.2d 473, 481 (Tex.Crim. App.1994) (en banc).

▮ Appellant also challenges the trial court's response to this request:

Name of witness whose statement is subject to disagreement:

*[C.L.]*

Lawyer questioning witness at time of statement:

*Mrs. [Quinones]*

Statement in Dispute:

*His testimony about when Ken spoke to him until when he heard the shot*

In response to this request, the trial court ordered the following excerpt to be read to the jury:

Question: Now, prior to you seeing Mr. Arnold, that is when Mr. Wimbley told you, "Stay right here, I don't want you to get hurt." Isn't that true?

wasn't he?"

Answer: Yes, ma'am.

Question: That's after you saw the unidentified black man and after you saw Mr. Wimbley; isn't that true?

Answer: Yes, ma'am.

Question: And at no time when you saw Mr. Wimbley did he ever say, '[C.L.], call the cops. I'm being chased,' did he?

Answer: No, ma'am.

Defense: May I have a moment, Your Honor?

Court: Yes, ma'am.

Defense: I'll pass the witness at this time, Your Honor.

Appellant contends this material did not fairly meet the scope of the jury's request for testimony but is instead a comment on the weight of the evidence. We disagree. The jury requested testimony that the defense elicited from C.L. during cross-examination regarding his conversation with Wimbley; this excerpt begins with that testimony. The jury asked for all of C.L.'s cross-examination testimony regarding that conversation, ending with C.L.'s testimony that he heard a shot. During his cross-examination, C.L. was not asked about gunfire, and thus, did not repeat his earlier testimony about hearing two gunshots. Accordingly, the trial court produced all of C.L.'s cross-examination testimony regarding his conversation with Wimbley. The material read to the jury is responsive to its request and does not represent a comment on the weight of the evidence.

We conclude the trial court did not abuse its discretion in selecting any of the challenged material to be read to the jury in response to its requests. We therefore overrule appellant's fourth issue.

### E. Second Re–Direct Examination

■ In his fifth issue, appellant contends the trial court erred by refusing to allow his defense counsel to conduct a second re-direct examination of him during the guilt/innocence phase of trial. This issue has not been preserved for review because appellant did not object at trial or make an offer of proof or bill of exception. Tex.R.App. P. 33.1(a), 33.2; *Guidry v. State*, 9 S.W.3d 133, 153 (Tex.Crim.App. 1999) (error in the exclusion of evidence may not be claimed unless the proponent perfects an offer of proof or a bill of exceptions). Accordingly, we overrule appellant's fifth issue.

### F. Requests for Abatement or Remand

■ Having overruled each of the five issues presented, we now reach appellant's two contingent requests for abatement or remand. Appellant first points out that the trial court refused to allow him to make an offer of proof or bill of exception to preserve error. Specifically, defense counsel cross-examined Woodard regarding her relationships with other men over the eleven-year period that she had known appellant and asked her, "Why did you stop dating Derrick?" The trial court sustained the State's objection to the relevance of this information, but refused to allow defense counsel to make an offer of proof. Appellant asks that, if we overrule all of his issues on appeal, we nevertheless remand the case to the trial court, order a hearing to allow appellant to make an offer of proof, and direct the trial court to forward the record of this evidence to this court. In addition, appellant asks that, if we overrule all of appellant's issues that seek a new trial, we remand the case to the trial court for the supplementation of the record "with an accurate copy of the *Allen* charge given at trial."

We deny these requests for several reasons. First, appellant does not contend that any evidence that might be added to the record is relevant to our determination of the issues presented on appeal. *See* Tex.R.App. P. 34.5(c)(1) (addressing supple-

mentation of the clerk's record "[i]f a *relevant* item has been omitted") (emphasis added); TEX.R.APP. P. 34.6(d) (addressing supplementation of the reporter's record "[i]f anything *relevant* is omitted") (emphasis added). Thus, remanding the case for supplementation would be a useless gesture.[7] *See Rivera v. State,* 981 S.W.2d 336, 341 (Tex.App.-Houston [14th Dist.] 1998, no pet.). Moreover, appellant asks that we reach these requests only "[i]n the event the Court does not grant Appellant a new trial based on the errors raised in [in the five issues presented on appeal]." But after overruling all of appellant's issues, nothing is left for our review. Appellant has not asked to file an amended or supplemental brief, and we are not required to consider issues that were not raised in his original brief. *See* TEX.R.APP. P. 38.1(e); *Garrett v. State,* 220 S.W.3d 926, 928 (Tex. Crim.App., 2007). Appellant has identified no purpose that would be served by supplementing the record, and does not contend that we would have occasion to review the additional materials. Finally, appellant does not allege that he was harmed by the omission of these materials, nor have we independently discovered any resulting prejudice to appellant. For each and all of the foregoing reasons, we deny appellant's requests for abatement and remand.

## IV. CONCLUSION

We hold the trial court did not abuse its discretion by denying appellant's request to include the offense of manslaughter in the jury charge because a rational jury could not find appellant guilty of only the lesser-included offense. We further hold appellant waived his complaint about the lack of limiting instructions re-

garding the use of extraneous-offense evidence and failed to preserve error, if any, arising from the trial court's refusal to allow defense counsel to question appellant a third time. We conclude the trial court did not err in overruling appellant's objection to the State's closing argument during the guilt/innocence phase of trial. Although the State and the trial court misstated the law during the punishment phase of trial, we conclude that these errors were harmless. Finally, we hold the trial court did not abuse its discretion in selecting portions of witness testimony to be read to the jury in response to its requests. Because nothing further remains for our review, we deny appellant's contingent requests for abatement or remand and affirm the trial court's judgment.

---

7. Remand for supplementation with the *Allen* charge would be futile for an additional reason. The clerk of the trial court has attested that no copy of the charge has been found, and we will not remand a case for supplementation under such circumstances. *See, e.g.,*

*Francis v. State,* 132 Tex.Crim. 591, 593, 106 S.W.2d 279, 280 (1937) (upholding trial court's denial of appellant's request for an order that was impossible for the court reporter to fulfill).