Affirmed and Memorandum Opinion
filed October 8, 2009

 

In
The

Fourteenth
Court of Appeals



NO. 14-08-00291-CR



Carl M. Williams, Appellant 

v.

The State of
Texas, Appellee 



On Appeal from
the 339th District Court

Harris County, Texas

Trial Court
Cause No. 1097855



 

MEMORANDUM OPINION 

Carl M. Williams was convicted of the felony offense
of murder, sentenced to ninety years’ confinement in the Institutional Division
of the Texas Department of Criminal Justice, and fined $10,000.  Williams
challenges the judgment contending the evidence at trial is both legally and
factually insufficient to support his conviction.  We affirm.

I

            On the morning of
December 22, 2006, the Houston Police Department received a call that a body
had been found in a bayou between Fondren Road and Sandpiper Drive.  After
surveying the scene, officers concluded that the bayou was not the location of
the shooting, but merely the place where the body was dumped.  

While investigating the shooting, officers discovered
that a disturbance had occurred on December 21, in unit 2205 at the Los Arcos
Apartments, which were close to the bayou.  When officers went to the
apartment, some of the front windows were broken.  They asked Timothy Hilton,
one of the tenants, if they could search the apartment, and he consented.  In
the entryway, the officers could see that someone had recently replaced a large
section of carpet.  Broken glass was not only outside the front of the
apartment, but officers also found broken glass outside the back bedroom
window.  Crime-scene investigators found blood spots near the replaced carpet,
as well as cleaning supplies—bleach and a mop—inside the residence.  

Hilton accompanied the officers to a police station
to give a statement.  When the officers returned with Hilton to the apartment,
his mother, Connie Kennedy, was there, and they spoke to her about the
disturbance.  The officers then took Hilton and Kennedy back to the station to
get a statement from Kennedy and to clarify Hilton’s statement.  Following
interviews with Hilton and Kennedy, the police were able to identify Carl M.
Williams as a suspect in the complainant’s death.  After five months of
searching, officers located Williams in May 2007.  They arrested and charged
him with the complainant’s murder.

  During the trial, Hilton testified that his mother
resided in unit 2205.  At the time of the shooting, Hilton lived with his
mother.  Other residents of unit 2205 were Quwanda Davis, Williams, another
person identified only as Drey, and the complainant.  Hilton stated that on
December 21, he was in the apartment with all of the above identified
occupants.  He testified that the complainant and Williams had “had words”
earlier that day.  Later that evening, Williams became upset because he could
not find his crack cocaine, and he accused Hilton of stealing it.  Hilton
testified that Williams brandished a gun and began waving it at him while
yelling “give me my stuff.”  All present, except Kennedy, began searching for
the lost drugs.  Hilton testified that while he was looking for the drugs,
Williams abruptly grabbed and pistol-whipped him.  He then stated that Williams
forced him to strip-off his clothes to see if he was hiding the crack cocaine. 
He testified that Davis told Williams that the complainant was laughing when
Williams was beating Hilton and that Williams should force the complainant to
strip as well.  Hilton said that Williams then forced the complainant to
strip.  Because Williams did not find drugs on the complainant, Hilton went
back to his room and continued searching for the drugs.  Hilton testified that
Williams then grabbed Kennedy and held a gun to her head.  Hilton stated that
while Williams was holding his mother, he told Hilton, “This is what’s going to
happen to the old b**** if you don’t give me my drugs.”  Hilton testified that
at first he could see Williams and his mother from the bedroom, but they moved
out of his line of sight.  He stated that he heard a “pop,” and then he dove
out the back bedroom window.  

Hilton testified that he later returned to the
apartment, and he saw the complainant lying on the living room floor.  He
stated that Williams and Davis, who were also at the apartment, left to buy
supplies to clean up the scene.  After trying unsuccessfully to clean the
carpet, Hilton cut up the bloody carpet and replaced it with a piece of clean
carpet from the empty apartment next door.  Hilton testified that he cleaned
the apartment along with Davis and Williams.  He stated that Williams suggested
they dispose of the complainant’s body.  Williams retrieved an empty grocery
cart, placed the body in it, and pushed the cart to the bayou between Fondren
and Sandpiper.  Hilton testified that he was not strong enough to push the
cart, so he walked beside Williams and occasionally pulled the cart.  Davis
followed them in a car and, after they dumped the body, Davis drove them back
to the apartment.  Hilton testified that the three of them proceeded to clean
the apartment until early the next morning.  He stated that he helped Williams
and Davis clean because he was afraid Williams would shoot him if he did not
help.

Kennedy’s testimony varied from her son’s.  Kennedy
testified that she never saw Williams point the gun at Hilton.  She also stated
that Williams pistol-whipped Hilton after he put the gun to her head, rather
than before.  Additionally, she testified that Williams did not force the
complainant to remove all of his clothing, only his socks and shoes.  Kennedy
stated that after the complainant took off his shoes, he suddenly jumped at
Williams and grabbed for his gun.  She testified that when the complainant
grabbed for the gun, she ran into the other room.  As she was running, Kennedy
stated she saw Williams turn and face the complainant and then she heard them
“tussling.”  She testified that she heard a “pop” and saw her son jump out the
back bedroom window.  Finally, after the shot was fired, Kennedy stated that
Davis and Drey ran out the front door followed shortly by Williams.  She
testified that the complainant was shot, and he lay bleeding in her living
room.   

Davis’s testimony also varied slightly from both
Hilton’s and Kennedy’s.  Like Kennedy, Davis testified that she saw Williams
point the gun only at Kennedy.  She stated that Williams did not pistol-whip
Hilton, but instead repeatedly hit Hilton with his fists.  Davis also testified
that the complainant not only took off his shoes, but his shirt as well.  Once
the complainant began undressing, Davis stated that she returned to her room. 
Then, Davis heard footsteps followed by a “pow.”  Davis testified that she
walked into the living room and saw Williams with the gun in his hand and the
complainant on the floor with “a bullet hole in his head.”  She stated that
Williams was muttering “he stupid” and “he grabbed the gun.”  After she and
Williams left the apartment, she testified that Williams also said “I think I
killed him,” “I killed him,” and that he would make it seem like self-defense. 
Finally, although Davis admitted that she helped dispose of the body, she
testified that she did not help clean the apartment.   

After hearing all of the evidence, the jury convicted
Williams of the felony offense of murder.  Williams was sentenced to ninety
years’ confinement and fined $10,000.  This appeal followed. 

II

Williams contends the evidence is legally
insufficient to support his murder conviction because there is no evidence he
intentionally or knowingly shot the complainant.  The State contends the jury
could infer intent to kill from Williams’s actions and words as well as from
his use of a deadly weapon.  We agree with the State.  

Williams also contends that the evidence presented at
trial is factually insufficient to support his murder conviction because it is
so contrary to the overwhelming weight of the evidence as to be clearly wrong
and unjust.  The State contends there is no indication that the jury’s decision
is “clearly wrong” or “manifestly unjust,” and the jury properly decided
Williams was guilty beyond a reasonable doubt.  We agree with the State.

A

In evaluating legal sufficiency of the evidence to
support a criminal conviction, we view all evidence in the light most favorable
to the verdict and determine whether a rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319 (1979); Hooper v. State, 214 S.W.3d 9,
13 (Tex. Crim. App. 2007); Childs v. State, 21 S.W.3d 631, 634 (Tex.
App.—Houston [14th Dist.] 2000, pet. ref’d).  We give deference to “‘the responsibility
of the trier of fact to fairly resolve conflicts in testimony, to weigh the
evidence, and to draw reasonable inferences from basic facts to ultimate
facts.’”  Hooper, 214 S.W.3d at 13 (quoting Jackson, 443 U.S. at
318–19).  The jury is the exclusive judge of the credibility of the witnesses
and of the weight to be given their testimony, and it is the exclusive province
of the jury to reconcile conflicts in the evidence.  Moseley v. State,
983 S.W.2d 249, 254 (Tex. Crim. App. 1998).  Hence, we do not reevaluate the
weight and credibility of all the evidence or substitute our judgment for the
fact finder’s.  King v. State, 29 S.W.3d 556, 562 (Tex. Crim.
App. 2000).  Appellate courts merely ensure that the jury’s decision was
rational.  Muniz v. State, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993); Harris
v. State, 164 S.W.3d 775, 784 (Tex. App.—Houston [14th Dist.] 2005, pet.
ref’d).     

In evaluating the factual sufficiency of the
evidence, we consider all the evidence in a neutral light.  Prible v. State,
175 S.W.3d 724, 730–31 (Tex. Crim. App. 2005); Newby v. State, 252
S.W.3d 431, 435 (Tex. App.—Houston [14th Dist.] 2008, pet. ref’d).  Our
analysis must consider the evidence appellant claims is most important in
allegedly undermining the jury’s verdict.  Sims v. State, 99 S.W.3d 600,
603 (Tex. Crim. App. 2003); Newby, 252 S.W.3d at 435.  In a
factual-sufficiency review, an appellate court asks whether the evidence
supporting the verdict is so weak or so against the great weight and
preponderance of the evidence as to render the verdict manifestly unjust.  Steadman
v. State, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009).  We do not substitute
our judgment for the fact finder’s judgment.  Drichas v. State, 175
S.W.3d 795, 799 (Tex. Crim. App. 2005); Newby, 252 S.W.3d at 435.  “‘[A]n appellate court must first be able to say, with some
objective basis in the record, that the great weight and preponderance of the .
. . evidence contradicts the jury's verdict before it is justified in
exercising its appellate fact jurisdiction to order a new trial.’”  Grotti
v. State, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008) (quoting Watson v.
State, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006)).  Although we are able
to second-guess the jury to a limited degree, “the factual-sufficiency review
should still be deferential, with a high level of skepticism about the jury’s
verdict required before a reversal can occur.”  Id.  

The legal- and factual-sufficiency standards are the
same for both direct and circumstantial evidence.   See King, 29 S.W.3d
at 565.  Circumstantial evidence, by itself, may be enough to support the
jury’s verdict.  Kutzner v. State, 994 S.W.2d 180, 184 (Tex. Crim. App.
1999).  Finally, the “cumulative force” of all the circumstantial evidence can
be sufficient for a jury to find the accused guilt beyond a reasonable doubt.  See
Powell v. State, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006).  

B

A person commits murder if he intentionally or
knowingly causes the death of another person or intends to cause serious bodily
injury and commits an act clearly dangerous to human life that causes the death
of another.  Tex. Penal Code Ann. § 19.02(b)(1), (2) (Vernon 2003).  A person
acts intentionally, or with intent, with respect to the nature of his conduct
or to a result of his conduct when it is his conscious objective or desire to
engage in the conduct or cause the result.  Id. § 6.03(a) (Vernon 2003). 
A person acts knowingly, or with knowledge, with respect to the nature of his
conduct or to circumstances surrounding his conduct when he is aware of the
nature of his conduct or that the circumstances exist.  Id. § 6.03(b). 
A person also acts knowingly if he is aware his conduct is reasonably certain
to cause the result.  Id.  

In deciding whether the defendant had the culpable
mental state to commit murder, the jury weighs the evidence introduced at
trial.  See Childs, 21 S.W.3d at 635.  These factual questions
“are almost always proven through evidence of the circumstances surrounding the
crime.”  Id.; see also Robles v. State, 664 S.W.2d 91, 94 (Tex.
Crim. App. 1984); Smith v. State, 56 S.W.3d 739, 745 (Tex. App.—Houston
[14th Dist.] 2001, pet. ref’d).  The jury may infer intent to kill from the
defendant’s use of a deadly weapon, unless the use does not rise to the level
of causing death or serious bodily injury.  Arnold v. State, 234 S.W.3d
664, 672 (Tex. App.—Houston [14th Dist.] 2007, no pet.); Childs, 21
S.W.3d at 635 (citing Flanagan v. State, 675 S.W.2d 734, 744 (Tex. Crim.
App. 1984)).  The Court of Criminal Appeals has concluded that a firearm is a
deadly weapon per se, and when the defendant uses it, intent to kill is
presumed.  Williams v. State, 567 S.W.2d 507, 509 (Tex. Crim. App.
1978); Smith, 56 S.W.3d at 745.  Furthermore, a jury can also infer
intent to kill through the defendant’s conduct, words, and acts.  Patrick v.
State, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995).  This conduct includes
evidence of a defendant’s flight from the scene of the crime.  See Clayton
v. State, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007).  Courts have
recognized that flight is additional incriminating circumstantial evidence from
which a jury may infer guilt.  Id. 

 

 

C

1

Although Williams contends he did not intend to kill
the complainant, Hilton’s, Kennedy’s, and Davis’s testimony all confirm
Williams was threatening the apartment’s occupants with a gun.  Williams was
angry because he could not find his crack cocaine, and unleashed his anger on
Hilton, Kennedy, and the complainant.  Although Hilton’s, Kennedy’s, and
Davis’s testimony differs, it is uncontroverted that Williams carried the gun
with him throughout the entire incident.  

Both Davis and Kennedy testified that to their
knowledge, Williams had the only gun in the apartment.   All of the witnesses
agree that Williams held Kennedy at gunpoint and threatened to kill her. 
Kennedy testified that only Williams and the complainant were in the living
room when the complainant was shot.  Additionally, Williams possessed the gun
both immediately before and immediately after the complainant was shot, and he
never denied shooting the complainant.  The jury could have inferred from
Williams’s use of a deadly weapon,  and other conduct described below, that he
had the requisite intent to kill.  

Davis testified that after Williams shot the
complainant, Williams said “he stupid” and “he grabbed the gun,” referring to
the complainant.  Davis also testified that Williams said, “I think I killed
him” and “I killed him.”  Davis stated that Williams said he would make the
shooting seem like self-defense.  

The jury also heard testimony that Williams fled the
scene after he and Hilton disposed of the complainant’s body.  Officers testified
they did not find Williams until May 2007.  When the officers went to execute
the arrest warrant, they saw a man run into what they suspected to be
Williams’s apartment.  After the police instructed everyone to exit the
apartment, Williams came out with his hands up and stated, “I’m the man you’re
looking for.”  The jury could have inferred Williams’s intent to kill because
he fled the scene of the shooting. 

Taken together, Williams’s use of a deadly weapon,
conduct at the scene, statements to others at the scene, and flight from the
scene, amount to ample circumstantial evidence that is legally sufficient to
support the jury’s verdict.  We overrule Williams’s first issue. 

2

            Concerning his
factual-sufficiency argument, Williams contends the evidence contrary to the
verdict was so strong that the jury could not have rationally determined his
guilt beyond a reasonable doubt.  Williams emphasizes Kennedy’s testimony that
she saw Williams and the complainant “tussling,” and saw the complainant grab
for the gun.  He notes that none of the witnesses actually saw him shoot the
complainant, nor could any testify to his culpable mental state.  Furthermore,
Williams highlights Kennedy’s testimony about her conversation with him shortly
after the shooting.  Kennedy testified that Williams told her “he didn’t mean
to do it,” that “he didn’t want that to happen and that he didn’t mean for it
to happen like it did,” and that he was sorry that it “went down at [Kennedy’s]
house.”  Williams also contends that but for the complainant charging and
jumping on him, he would not have shot the complainant.

            Although there
was not an eyewitness to the shooting, a consideration of the evidence
discussed above in a neutral light reveals the jury had enough circumstantial
evidence to rationally reach its conclusion.  The jury heard evidence that Williams:
(1) was angry his cocaine was missing, (2) threatened the apartment occupants, (3)
held Kennedy at gunpoint, (4) struck Hilton with a gun, (5) admitted to
shooting the complainant, (6) disposed of the complainant’s body, and (7) fled
the scene of the shooting.  We conclude that the proof of guilt is not so
obviously weak or against the great weight and preponderance of the evidence as
to render the verdict clearly wrong or manifestly unjust.  We therefore hold
the evidence is factually sufficient to support the jury’s verdict, and
overrule Williams’s second issue.

 

 *
* *

For
the foregoing reasons, we affirm the trial court’s judgment.

 

 








 

                                                                                    

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

 

 

Panel consists of Justices Seymore,
Brown, and Sullivan.

Do
Not Publish — Tex. R. App. P. 47.2(b).