COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS


| | | |
|---|---|---|
| LEO MARTINEZ, | § | No. 08-17-00106-CR |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | |
| | § | 409th District Court |
| THE STATE OF TEXAS, | § | |
| | § | of El Paso County, Texas |
| Appellee. | § | |
| | § | (TC# 20120D01991) |
| | § | |

## **O P I N I O N**

Appellant Leo Martinez appeals his conviction for murder. In his sole issue on appeal, Martinez contends the trial court abused its discretion in denying his request for an instruction on manslaughter because there was some evidence that he acted recklessly in killing his mother. We affirm.

### **BACKGROUND**

Appellant Leo Martinez killed his mother on the night of February 5, 2012. He had been living with her for a little under a year at that point. Before moving in with her, Martinez had been living in Denver, Colorado with his father. While in Denver, he had rekindled a high-school friendship with Stephanie Paniagua that ultimately turned into a romantic relationship. Paniagua moved to Denver to live with Martinez, and the two had a daughter together. But in 2009,

Martinez was arrested for menacing, abusive language or threats, and creating a danger of violence against Paniagua.  The two ended their relationship, and Paniagua moved to Alaska, taking their daughter with her.  Martinez began abusing alcohol and drugs, and he was arrested again the following year for assault against a different girlfriend.  In 2011, he called his mother and asked her if he could move in with her in El Paso, claiming he was tired of abusing alcohol and drugs and wanted to reform his life.  She agreed, and he moved in with her shortly thereafter.

Martinez was able to quit drinking at first, and he enrolled in school to become a massage therapist.  He reconnected with Paniagua, and she and their daughter came and visited Martinez in El Paso.  But Martinez began drinking again, and he was arrested in September 2011 for driving while intoxicated.  His mother posted his bail but was furious with him for continuing to drink after having promised her he would quit.  Their relationship quickly deteriorated.  Martinez continued drinking, and he and his mother would fight about it frequently.

On the day of the murder, Martinez was drinking in his room and listening to music.  His mother came in and told him the music was too loud and again complained of his drinking.  The situation escalated, and his mother accused him of running away from his problems and told him Paniagua wanted nothing to do with him.  She told him she did not want him to stay at the house with her anymore and to pack his belongings.  Martinez began packing and, unbeknownst to his mother, packed a gun that belonged to his mother's boyfriend, Mariano Peralta.  His mother returned to the room while he was packing and told him not to leave until after his upcoming DWI hearing because she was responsible for his posted bail.

Martinez left and walked to a Love's Truck Stop about two miles away, taking the gun with him.  He drank a beer there and watched part of the Super Bowl, which was on that evening.

2

With about five minutes left in the game, he returned to his mother's house and remained outside for about half an hour, "scoping" his mother's every move inside. She could not see him outside because he was concealed behind a fence. Martinez eventually went inside and confronted his mother.

She asked what he was doing back at the house, stating she thought he had left for good after their last conversation. She complained to him again about his drinking and an argument ensued. His mother then made a phone call to one of her friends and spoke with her for an extended period of time. She finished her conversation and was about to call someone else when Martinez told her he needed to use the phone. He later stated he did this as a decoy to get her off the phone. His mother handed the phone to him and told him not to be long. She then walked away to her bedroom. Martinez followed her, bringing the gun with him, which he had previously cocked and loaded. When she got to her bedroom, she turned to say something to Martinez, who was standing just outside her room in the hallway. As she turned toward him, Martinez raised the gun and shot her in the face. He looked at her body on the floor and knew immediately she was dead.

Martinez left the home in Peralta's truck. He stopped at Love's again, this time to buy a thirty-count pack of beer. Using his mother's cellphone, he attempted to call his younger brother but did not get an answer. He also called a female friend living in Hatch, New Mexico, and asked her if they could meet up in El Paso. He did not want to travel to her home because he was afraid he would be caught if he went through the border-patrol checkpoint. But his friend told him she was unable to meet him because of the late hour. He then called Paniagua.

Paniagua was at her home in California with their daughter when she received Martinez's

3

call. She was surprised by the call because they were not on speaking terms. The two spoke for around an hour and a half. Paniagua could tell something was wrong and repeatedly asked him what had happened, but he would not tell her. After repeated rebuffs, Paniagua finally asked Martinez if he had killed someone. He told her he had killed his mother. She urged him not to joke about something like that, and he replied that he was not joking. Martinez told her he had shot his mother after an argument about his drinking and his failures as a father. He also kept repeating, "I can't believe this happened." While they were on the phone, Paniagua texted several people in an effort to get someone to go check on Martinez's mother. The only person who responded was Jesse Solorio. Paniagua told Solorio to call 911 and ask them to send an ambulance to Martinez's mother's address. Solorio called 911 to report that Paniagua was on the phone with Martinez and that Martinez had told her that he had killed his mother and he planned on killing himself. Solorio informed the 911 operator that Martinez was on his way to a Motel 6 on Montana Ave.

Paniagua and Martinez continued to speak while he drove to the Motel 6. When he arrived, Martinez went to the front desk and obtained a room from the clerk. As he walked back outside, he told Paniagua that officers were standing by the vehicle he had driven to the motel. She advised him to act normally and not to approach the officers. Over the phone, she could hear him approach the officers anyway, who asked him for his name. When he told them who he was, the officers arrested him.

Detective Antonio Arias responded to the scene at Martinez's mother's home. He spoke with other detectives there, and after crime-scene technicians arrived, he learned Martinez was being held in the Crimes Against Persons Office at the sheriff's headquarters. Arias went to the

4

office and conducted a recorded interview with Martinez. After being read his *Miranda*[1] warnings, Martinez inquired how the police had found him at the Motel 6. Arias admitted Paniagua had contacted them, and Martinez stated that her doing so was "fucked up." Martinez then detailed to Arias the events as described above. He also expressed remorse for what he had done, stating "we should have just sat down and talked about it."

Martinez was charged with murder for killing his mother and was subsequently convicted by the jury. He was sentenced to life in prison and a fine of $10,000. This appeal followed.

## DISCUSSION

In his sole issue on appeal, Martinez contends the trial court abused its discretion in denying his request for an instruction on manslaughter because there was some evidence that he was aware of but consciously disregarded a substantial and unjustifiable risk that his actions would cause his mother's death.

### *Standard of Review*

We determine whether an appellant was entitled to a charge on a lesser-included offense by considering all of the evidence introduced at trial, whether produced by the State or the defendant. *Penry v. State*, 903 S.W.2d 715, 755 (Tex.Crim.App. 1995)(*citing Goodwin v. State*, 799 S.W.2d 719, 740 (Tex.Crim.App. 1990)). We utilize a two-pronged test in our review. *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex.Crim.App. 2012). First, we determine whether the proof necessary to establish the charged offense also included the lesser offense. *Id*., (*citing Hall v. State*, 225 S.W.3d 524, 535–36 (Tex.Crim.App. 2007)). If the offense is in fact a lesser-included offense, we move to the second step of the test and consider "whether there is some

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

evidence that would permit a rational jury to find that, if the appellant is guilty, he is guilty only of the lesser offense." *Id.*, at 383. It does not matter whether the evidence is strong or weak, unimpeached or contradicted. *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex.Crim.App. 1993)(*citing Bell v. State*, 693 S.W.2d 434, 442 (Tex.Crim.App. 1985)). But the evidence must be germane to the lesser-included offense and cannot be merely speculative; that is, it must be affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense. *Cavazos*, 382 S.W.3d at 385.

### *Applicable Law*

A person commits murder when they intentionally or knowingly cause the death of an individual. TEX.PENAL CODE ANN. § 19.02(b)(1). Manslaughter occurs when a person recklessly causes the death of an individual. TEX.PENAL CODE ANN. § 19.04(a). A person acts recklessly with respect to the circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. TEX.PENAL CODE ANN. § 6.03(c). As the State concedes here, manslaughter is a lesser-included offense of murder. *Cavazos*, 382 S.W.3d at 384.

Typically, in cases of a shooting death, a defendant is entitled to an instruction on manslaughter if some evidence demonstrates that the gun discharged accidentally during a struggle or that the defendant only intended to frighten the victim. *Hayes v. State*, 728 S.W.2d 804, 810 (Tex.Crim.App. 1987); *see also Arnold v. State*, 234 S.W.3d 664, 672 (Tex.App.—Houston [14th Dist.] 2007, no pet.)("Thus, courts have typically found that a manslaughter instruction was required based on some evidence that the gun discharged accidentally or that the defendant only intended to frighten the complainant."); *Gilbert v. State*, 196 S.W.3d 163, 165 (Tex.App.—

Houston [1st Dist.] 2005, pet. ref'd)(holding that the defendant had not raised the issue of recklessness in his testimony where he did not state he had fired the gun in an effort to shoot near the victim to scare him). Therefore, for Martinez to have been entitled to an instruction on manslaughter, there must be some affirmative evidence that he did not intend to kill his mother but only acted recklessly in shooting her. *Cavazos*, 382 S.W.3d at 385.

### *Analysis*

Here, Martinez points to four pieces of evidence that he claims, taken together or individually, constitute some evidence that his actions in shooting his mother were reckless, and he was therefore entitled to an instruction on manslaughter. The first piece of evidence he points to is an exchange between Paniagua and the prosecutor, in which Paniagua stated Martinez told her the shooting was an accident:

[The State]: Did the defendant tell you in any way that this was a mistake or an accident?

[Paniagua]: Yes.

[The State]: He did?

[Paniagua]: Yes.

. . .

[The State]: When I had asked you whether the defendant said it was a mistake, you said yes. Then you kind of relayed a part of what he told you. What you told the jury, that's different than saying it is an accident, wouldn't you say?

[Paniagua]: Yeah.

[The State]: Could you say that a little bit louder?

[Paniagua]: Yes.

7

Martinez also points to his recorded interview with Detective Arias, in which he told the detective, "I didn't plan it. It just happened. I couldn't take it back." He also notes Detective Arias was asked on cross-examination whether he believed Martinez was telling the truth during the interview, and that Arias responded, "For the most part, yes." Finally, he points to the testimony of the medical examiner, Doctor Contin, who testified that a homicide—the official cause of death in this case—could be the result of murder, manslaughter, or criminally negligent homicide. These statements, Martinez asserts, would allow the jury to rationally conclude he was aware of but consciously disregarded a substantial and unjustifiable risk that pointing the gun at his mother's head and pulling the trigger would cause her death.

None of these statements, when taken in context, provide a scintilla of evidence that Martinez acted recklessly in shooting his mother. Although Paniagua testified that Martinez stated it was a mistake to kill his mother, she clarified his statement did not mean it was an accident. But even without this clarification, as the Court of Criminal Appeals has held, "[p]ulling out a gun, pointing it at someone, pulling the trigger twice, fleeing the scene (and the country), and later telling a friend 'I didn't mean to shoot anyone' does not rationally support an inference that Appellant acted recklessly at the moment he fired the shots." *Cavazos*, 382 S.W.3d at 385; *see also Shannon v. State*, No. 08-13-00230-CR, 2015 WL 6394922, at *9 (Tex.App.—El Paso Oct. 21, 2015, no pet.)(not designated for publication)(holding that when the record demonstrates a defendant committed an act that was "clearly dangerous to human life," such as shooting a victim point blank or stabbing a victim in the throat, the evidence will not support a finding that the defendant acted recklessly even when the defendant testifies he did not intend to kill his victim.). In his video-recorded statement, Martinez admitted he lied to his mother to get her off of the phone

8

"as a decoy," followed her down the hallway to the bedroom with the gun cocked and loaded, and when she turned around from the bedroom to say something to him, he raised the gun and shot her in the face. Following this type of deliberate conduct, which was clearly dangerous to human life, any subsequent statement to Paniagua that killing his mother was a mistake would not rationally support an inference that he acted recklessly in shooting his mother as would support a charge for manslaughter. *Cavazos*, 382 S.W.3d at 385.

The same analysis holds true for his statement to Detective Arias: "I didn't plan it. It just happened. I couldn't take it back." Even if this could be construed as an unequivocal statement that he did not mean to kill his mother, it would not rationally support an inference he acted recklessly in shooting her in the face. *See Shannon*, 2015 WL 6394922, at *9. As to Detective Arias's equivocal statement that he believed Martinez was telling the truth in his video-recorded statement "[f]or the most part," it could only support, at best, an inference that Arias believed Martinez when he stated, "I didn't plan it. It just happened. I couldn't take it back." Because that statement itself is insufficient to support a charge for manslaughter, Arias's possible agreement with the statement has no bearing on the issue. Finally, Doctor Contin's testimony that homicide can result from murder, manslaughter, or criminally negligent homicide was merely an agreement with defense counsel's abstract question:

> [Defense]: Dr. Contin, when you state that the manner of death is homicide, are you familiar with Section 19.01 of the Texas Penal Code?
>
> [Contin]: Not specifically, no.
>
> [Defense]: Well, let me ask you this: Homicide can be murder, manslaughter or criminally negligent homicide?
>
> [Contin]: Yes, I am aware of this.

9

[Defense]:   It could be manslaughter or reckless, the homicide?

[Contin]:   Yes.

Contin was merely confirming homicide can be the result of murder, manslaughter, or criminally negligent homicide, not that he believed Martinez acted recklessly in this case.   As such, Contin's testimony does not constitute affirmative evidence that both raises manslaughter and rebuts or negates the mens rea of murder.   *Cavazos*, 382 S.W.3d at 385.

Because there is no evidence in the record that would permit a rational jury to find that Martinez was guilty only of the lesser offense of manslaughter, the trial court did not abuse its discretion in denying his request for an instruction on manslaughter.   *Cavazos*, 382 S.W.3d at 383. Issue One is overruled.

## CONCLUSION

Having overruled Appellant's sole issue on appeal, the judgment of the trial court is affirmed.

July 10, 2019

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)

10