

NUMBER 13-10-00124-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**MICHAEL ANTHONY MANCHA,**                                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                              **Appellee.**

---

**On appeal from the 139th District Court
of Hidalgo County, Texas.**

---

# MEMORANDUM OPINION

### Before Justices Garza, Benavides, and Wittig[1]
### Memorandum Opinion by Justice Wittig

Appellant, Michael Anthony Mancha, age sixteen at the time of the homicide, was

certified as an adult.  He was indicted on three counts of the capital murder of Miguel

Cahue.  Mancha pled not guilty but the jury found him guilty of the lesser-included offense

---

[1] Retired Justice Don Wittig assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to the government code.  *See* TEX. GOV'T CODE ANN. § 74.003 (Vernon  2005).

of murder, and assessed his punishment at ninety-nine years at the Institutional Division of the TDCJ. Notice of appeal was timely filed. In a single issue, Mancha argues the trial court abused its discretion by denying his request for inclusion of the lesser-included offense of manslaughter in the jury charge. We reverse and remand.

## I. Background

Hazael (Ozzy) Gonzales, eighteen, and Joel (Jay) Salinas owed a lot of money to several loan agencies and had fallen behind in payments. Ozzy came up with a plan to rob Cahue, seventy-four, who lived across from the park at a McAllen trailer park. In preparation for the robbery, Wendy Gomez, fourteen, went to the Wal Mart store and stole some latex gloves and duct tape. Wendy knew Mancha but was closer to Ozzy. Ozzy in turn was closer to Mancha. Ozzy knew that Cahue liked to have sex with young boys. They planned to take a couple young males to visit Cahue, and gain access to his trailer home. Cahue was thought to have money and have some "good stuff" to steal. Ozzy and Jay were joined by Wendy's brothers Alfredo Gomez and Marvin Gomez, ages nineteen and sixteen, respectively. Jose de Jesus Martinez, seventeen, and Mancha completed the group.

The teens went to Cahue's trailer once but decided it was too late so they returned August 6, 2008. They brought with them duct tape, latex gloves, and a BB gun. Mancha and Alfredo initially held Cahue on the floor, while their cohorts searched for items to steal. Alfredo held Cahue's legs and Mancha sat on his upper body, placing a sweater over his head. Cahue yelled at his captors and struggled to free himself, kicking and scratching. Cahue's daughter described her father as fit, able to defend himself, native Chicagoan, who lifted weights. Alfredo at some point turned Cahue over to Mancha while Alfredo then

2

helped the others search the trailer for valuables. Jose, one of the State's eye-witnesses, testified Mancha hit Cahue in the face with his hand. He did not see Mancha strike Cahue with any object. Jose said Wendy kicked Cahue. Another State witness, Marvin, testified he saw Mancha hold Cahue's hands, cover his face with a gray sweater, and strike Cahue with a candleholder. Wendy hit Cahue three times and "stomped him on the butt" two times, according to Marvin. The episode took about ten to fifteen minutes according to Marvin, and thirty minutes according to other testimony. During the ten to fifteen minute episode, Mancha was "holding the man down." Before testifying, Marvin, also charged with capital murder, entered into a plea bargain for a reduced charge and five years in the penitentiary. Similarly, Jose had his capital murder charges reduced and pled to receive five years in the penitentiary. These two accomplices were the primary witnesses for the State.

Mancha's statement to police, admitted into evidence, stated he met with Marvin, Alfredo and Wendy. Wendy told of two "gay guys" who knew a "greedy old man" who hung out at the park and had money. The two guys would take the group to the man's trailer. Alfredo went in first because Cahue thought he was going to have sex with him.[2] Later Mancha went in and told Cahue to lay down on the ground, but he would not listen, so Mancha, one-hundred-and-ten pounds, grabbed the larger man and knocked him to the floor. While Cahue was being held, he kept struggling, grabbing Mancha's neck ". . .and I kept holding on to the old man trying to calm him down." The statement continued, Wendy walked up to Mancha and Cahue and kicked Cahue in the face, but not too hard.

---

[2] Investigators found a box of nude photos of young men and used condoms at the scene corroborating the group's story. Wendy erased nude photos of males from the digital camera stolen from Cahue.

3

Cahue started struggling again and put his hand in the back of Mancha's pants. Mancha punched him some more in the face and head. Cahue was bleeding a lot from the head and face. When the robbery was complete, they grabbed Cahue by his arms and dragged him to the bathroom and left him there. When Mancha left Cahue, he was breathing and Mancha did not think he was going to die. Mancha stated he was not going to kill Cahue. Afterwards, the group went to the park and then behind Wendy's apartment where they burned the sweater and latex gloves used in the robbery. Mancha's statement was detailed and extensive.

According to other testimony, when the group left, some were afraid Cahue would come after them while some were not afraid. When officers arrived on August 8, 2008, the television and air conditioning were both on and there were blood stains on the carpet. The door next to the bedroom was locked but was opened with a set of keys located in the trailer. The pathologist found lacerations to Cahue's head around the left and right eyebrow, a bruise on his right forehead, small scrapes on his right hand and right knee, and bruising on his right calf. The pathologist's internal exam showed extensive bruising along the chest wall, rib fractures, as well as discoloration to the back and back of his head. The pathologist opined that the cause of death was blunt force head and chest trauma and either set of injuries was sufficient to have killed Cahue.

## II. Standard of Review

Our first duty in analyzing a jury charge issue is to decide whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743-44 (Tex. Crim. App. 2005) (citations omitted). If we find error, we analyze that error for harm. *Id.* The degree of harm necessary for reversal depends on whether the appellant preserved the error by objection. *Id.* Under *Almanza*,

4

jury charge error requires reversal when the defendant has properly objected to the charge and we find "some harm" to his rights. *Id.* (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). Thus, we review alleged charge error by considering two questions: (1) whether error existed in the charge; and (2) whether sufficient harm resulted from the error to compel reversal. *Id.*

### III. Charge Error

The State does not contest that Mancha timely requested a jury instruction for the lesser-included offense of manslaughter. The trial court refused to give the instruction. To determine whether a charge on a lesser-included offense should be given, the court of criminal appeals has implemented a two-step test. *Mathis v. State*, 67 S.W.3d 918, 925 (Tex. Crim. App. 2002) (citing *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex. Crim. App. 1985); *Royster v. State*, 622 S.W.2d 442, 444 (Tex. Crim. App. 1981) (plurality opinion)). The first step is to decide whether the offense is a lesser-included offense of the offense charged. *Id.*; TEX. CODE CRIM. PROD. ANN. art. 37.09 (Vernon 2008); *see also*, e.g., *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993); *Aguilar*, 682 S.W.2d at 558. The courts have recognized that manslaughter is a lesser-included offense of capital murder. *See Cardenas v. State*, 30 S.W.3d 384, 392-93 (Tex. Crim. App. 2000). Therefore, the first prong of the test is satisfied.

The second step of the *Aguilar/Rousseau* test requires an evaluation of the evidence to determine whether there is some evidence that would permit a jury to rationally find that the defendant is guilty only of the lesser offense. *Mathis*, 67 S.W.3d at 925 (citing *Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998); *Rousseau*, 855 S.W.2d at 672)). "In other words, there must be some evidence from which a jury could rationally acquit the

defendant of the greater offense while convicting him of the lesser-included offense." *Id.* (citing *Moore*, 969 S.W.2d at 8). The evidence must establish the lesser-included offense as a valid rational alternative to the charged offense. *Id.* (citing *Wesbrook v. State*, 29 S.W.3d 103, 113-14 (Tex. Crim. App. 2000)); *see also Arevalo v. State,* 943 S.W.2d 887, 889 (Tex. Crim. App. 1997).

The only difference between murder and manslaughter is the mental state required. *Ross v. State*, 861 S.W.2d 870, 875 (Tex. Crim. App. 1992) (en banc). Murder is statutorily defined as intentionally or knowingly causing the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2008). A person acts intentionally, or with intent, with respect to the nature of his conduct, or to a result of his conduct, when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). In contrast, manslaughter is defined as recklessly causing the death of an individual. *Id.* § 19.04(a). A person acts recklessly or is reckless with respect to circumstances surrounding his conduct, or the result of his conduct, when he is aware of, but consciously disregards, a substantial and unjustifiable risk that the circumstances exist or the result will occur. *Id.* § 6.03(c); *Arnold v. State*, 234 S.W.3d 664, 671 (Tex. App.–Houston [14th Dist.] 2007, no pet.).

Murder is a "result of conduct" offense, which means that the culpable mental state relates to the result of the conduct, the causing of the death. *Schroeder v. State*, 123 S.W.3d 398, 400-01 (Tex. Crim. App. 2003). The fact finder would have to conclude that Mancha recklessly caused Cahue's death. TEX. PENAL CODE ANN. § 19.04.

A manslaughter charge is required if there is any evidence from which a jury could

6

conclude the defendant did not intentionally or knowingly kill an individual, but consciously disregarded a substantial and unjustifiable risk the result would occur. *Lugo v. State*, 667 S.W.2d 144, 147 (Tex. Crim. App. 1984). "[A] defendant may be shown to be guilty only of the lesser offense if the evidence presented is subject to different interpretations." *Saunders v. State*, 840 S.W.2d 390, 392 (Tex. Crim. App. 1992) (holding that the mental state was shown circumstantially; no direct evidence was presented regarding appellant's intent to kill or injure, his knowledge that death could result, or his awareness that a risk of death existed; evidence simply showed that appellant had squeezed the back of the baby's head fifteen days before the child's death, (whose death was likely caused by a similar squeeze)).

"If there is evidence within a defendant's testimony which raises the lesser-included offense, it is not dispositive that this evidence does not fit in with the larger theme of that defendant's testimony." *Jones v. State*, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998). "Whether there is evidence, within or without the defendant's testimony, which raised the lesser-included offense controls the issue of whether an instruction on the lesser-included offense should be given." *Id.* So long as there is some evidence which is "directly germane" to a lesser-included offense for the factfinder to consider, then an instruction on the lesser-included offense is warranted. *Id.* (citations omitted).

"The issue is not one of theoretical possibility, but one of whether, given all the circumstances, it is reasonable to infer that the particular individual on trial was in fact aware of the risk." *Dillon v. State*, 574 S.W.2d 92, 95 (Tex. Crim. App. 1978). A defendant, however, need not be aware of the specific risk of another's death in order to commit manslaughter. *Trepanier v. State*, 940 S.W.2d 827, 829 (Tex. App.–Austin 1997,

7

pet. ref'd).

## IV. The State's Argument

Citing *Arnold*, 234 S.W.3d at 672, the State initially argues that a defendant's isolated statement that he did not intend to kill does not constitute evidence upon which a jury could rationally find his actions merely reckless. In *Arnold*, the defendant argued that testimony created an inference that the gun discharged accidentally. *Id.* The court held that the defense argument relied on isolated statements taken out of context and gave interpretations to the appellant's statements that appellant himself did not give. *Id.* (citing *Godsey v. State*, 719 S.W.2d 578, 584 (Tex. Crim. App. 1986) (en banc)). "Fragments of testimony 'cannot be plucked out of the record and examined in a vacuum.'" *Id.* Any inference that the gun discharged accidentally was negated by the defendant's testimony on cross-examination describing his state of mind:

State:     And your testimony is you jumped and the gun went off, correct?

Appellant:     Yes, ma'am – yes, sir.

State:     Now, did you intentionally or knowingly fire that gun at Ken Wimbley?

Appellant:     Yes, sir.

State:     So, it wasn't an accident that you shot him, correct?

Appellant:     No, sir.

*Id.* While we agree that isolated statements out of context would not support a manslaughter charge, such is not the case before us. First, the record here affords no evidence or admission of intent to murder. The State's own witnesses said their intent was to rob. Furthermore, as we discuss below, the contextual evidence, both direct and

8

circumstantial, supports an inference that the resulting death was caused recklessly, rather than intentionally.

Next, the State cites *Wesbrook*, 29 S.W.3d at 113. There, the appellant claimed the trial court erroneously denied his request for a jury instruction on the lesser-included offense of aggravated assault. *Id.* The only evidence supporting an aggravated assault instruction came from appellant himself when he took the stand and, under direct examination, admitted that he fired the rifle but denied he possessed any intent to kill the five victims. *Id.* As the State argues, a defendant's statement must be considered in the context of the entire record to determine whether there was evidence from which the jury could have concluded that the appellant was only guilty of manslaughter. *See id.* at 113-14. In *Wesbrook*, the trial record showed appellant acted intentionally, or at the least, knowingly, when he walked into an apartment armed with a high-powered rifle. *Id.* at 112. He fired a single shot at close range into the chest of the first victim, and continued to fire the weapon, again at close range, into four more individuals, choosing as his target either their head, chest, or abdomen. *Id.* Physical evidence from the scene and the condition of the bodies suggest that one victim was shot as he attempted to escape from the apartment and another was shot while on his knees. *Id.* The only contrary evidence that this was not an intentional or knowing act was appellant's own assertion that he did not intend to kill. *Id.* Given the entire record, this was not evidence from which a jury could rationally conclude that appellant was guilty only of aggravated assault. *Id.* at 113-14 (citing *Jackson v. State*, 992 S.W.2d 469, 475 (Tex. Crim. App. 1999) (holding defendant not entitled to instruction on the lesser-included offense of aggravated assault when evidence showed appellant, at least, guilty of homicide). Although an instruction on

9

aggravated assault was given here, arguably Mancha was not entitled to one. *See id*.

Unlike *Wesbrook*, Mancha did not shoot multiple victims at close range with a high powered rifle. We must consider the entire record where multiple participants indicated no intent to kill and where Ozzy's entire scheme, as well as that of his accomplices, was to rob Cahue. Thus, Mancha's statement of lack of intent to kill is corroborated by the express intent of the others, the use of duct tape, a BB gun, and even the logical inference of the pathologist's testimony that blows to the chest by Wendy could have caused the death of Cahue. "Either one could kill him, the head trauma or the chest trauma."

The State argues that Mancha's statement that he "did not intend to kill the victim but was only trying to restrain him," is an interpretation that can only be reached if specific aspects are taken out of context. However, in the context of Mancha's statement, he told Cahue to lie down on the ground. Mancha's statement recited that Alfred told Cahue several times to get down also but Cahue would not listen. Mancha grabbed Cahue and knocked him down to the floor. He held Cahue who kept telling the group "stuff." Mancha had duct tape hidden in his sweater. "We were trying to tie him up and hold him down, but he kept struggling with us." While being held, Cahue bit Mancha on the left thumb. "I punched him several times in the face to stop him from struggling but he would not stop." Cahue kept grabbing Mancha's neck and pinching him with his hands. "Alfred walked out of the house and I kept holding on to the old man trying to calm him down." Wendy walked up and kicked Cahue in the face. Cahue starting struggling again and put his hand in the back of Mancha's pants. "I punched him some more in the face and head." Cahue was dragged to the back room. "When I left the old guy was still breathing. I did not think that he was going to die."

10

We also note that the State focuses almost exclusively on certain isolated parts of Mancha's statement, rather than all of the contextual evidence we are required to consider. *Enriquez v. State*, 21 S.W.3d 277, 278 (Tex. Crim. App. 2000) (stating that the appellate court must examine the entire record instead of plucking certain evidence from the record and examining it in a vacuum).

The State next cites *Mathis v. State*, 67 S.W.3d 918, 925-26 (Tex. Crim. App. 2002). Like *Wesbrook*–indeed citing *Wesbrook*–the defendant shot multiple people. He killed one with two shots to the head, including one shot to the back of the head, and shot a third person between her eyes and yet still attempted to obtain a lesser charge of aggravated assault. *Id.* (citing *Wesbook*, 29 S.W.3d at 103) (holding defendant not entitled to instruction on the lesser-included offense of aggravated assault when evidence showed appellant, at least, guilty of homicide)). Witnesses testified defendant's actions were calm and collected. *Id.* The defendant vacillated between insisting he had not aimed the gun when shooting and stating that he had indeed aimed and shot:

> I did not actually know at the time that I was – I was shooting [Almaguer]. I did aim the gun and pull the trigger, but I never meaned [sic] – I just shot. I never aimed it or anything. It just hit her. . . . I never said I didn't aim the gun and pull the trigger. I have been telling you the whole time that I did aim the gun and pull the trigger. . . . after they started hollering and screaming, then I went in there and that's when I aimed and pulled the gun and pulled the trigger. . . . I said I pointed the gun – I said I pointed it – I aimed – I didn't mean to just point it. . . . I just pointed it and shot . . .. I just pointed the gun and shot. I wasn't even really just looking . . . when I shot the gun, but I did aim it over there. I wasn't never even looking . . . I just pulled the trigger. . . . I just closed my eyes and shoot [sic].

*Id.* The evidence of the defendant's actions reflected he was calm and calculating, not panicked or frightened. *Id.* While claiming recklessness and no intent to kill, his own testimony was inconsistent, for example he insisted he did not aim the weapon and yet

11

stating he did aim and shoot. *Id.* "Appellant's testimony that he did not intend to kill anyone does not amount to evidence upon which a jury could rationally find appellant only acted recklessly with respect to killing Hibbard, and not intentionally." *Id.* Apart from the defendant's own testimony that he did not intend to kill anyone, there was no other evidence in support of such theory, and "in fact the evidence refuted that testimony." *Id.* The *Mathis* court concluded that the defendant's testimony did not supply evidence upon which a jury could rationally find appellant's actions toward Hibbard were merely reckless and were not at least knowing. *Id.* (citing *Jackson*, 992 S.W.2d at 475). *Mathis* likewise does not apply for several reasons. First, the requested lesser-included charge in this case was manslaughter, not aggravated assault. Second, Mancha's statement does not vacillate between aiming a weapon and insisting he did not aim. The only arguable inconsistency in the statement, as the State points out in its next argument, was Mancha's gratuitous statement he didn't remember a lot.[3] Third, Mancha was not armed with a high powered rifle and did not shoot or kill multiple people or harm any other person. The evidence did not even put the BB gun in his hands. Fourth, the State's own witnesses stated that their intent was to rob, and the plan to rob necessarily included restraining, but not killing, Cahue. In context, Ozzy's plan was designed and implemented as a robbery, not a multiple homicide.

Next, addressing the memory portion of Mancha's statement, the State argues that evidence of a defendant's inability to remember causing the death of the victim does not entitle the defendant to a charge on the lesser-included offense of manslaughter, citing *Schroeder*, 123 S.W.3d at 401. In *Schroeder*, the defendant testified that although he

---

[3] Mancha's detailed and expansive statement was one and a half legal pages, single spaced.

12

remembered the events leading up to the shooting, he suddenly "blacked out" and had no recollection of actually shooting the victim. *Id.* By his own admission, he was not aware that he caused the victim's death at the time of the shooting. *Id.*

> The court of appeals' reliance on the cited cases involving reckless conduct is misplaced simply because those cases do not involve defendants who were *completely incognizant* of what occurred at the time they engaged in the charged conduct. Here, the evidence of the appellant's struggle with the victim and his statements, "It was an accident" and "I did not mean to," are relevant to the defensive issues of accident and self-defense, but such evidence does not allow a finding of recklessness given the appellant's self-described mental state when the victim was killed. Evidence of a defendant's inability to remember causing the death of the victim does not entitle the defendant to a charge on the lesser-included offense of manslaughter. . . .

*Id.* (emphasis added).

In *Schroeder*, the defendant was charged with the murder of his wife by shooting her with a firearm. *Id.* at 399. The defendant called 911 and told the operator that he and his wife had struggled over a gun and that it "went off a couple of times," shooting his wife in her chest. *Id.* The deceased was shot three times, two of the bullets entered her body from the side, and one from the back. *Id.* The .357 pistol contained five spent shells and one unfired cartridge. *Id.* The appellant told one of the officers that "it was an accident" and that he "did not mean to [shoot her]." *Id.* The defendant testified he was arguing with his wife when she presented the pistol. They struggled, he blacked out or something, and couldn't remember what happened. *Id.* The State questioned:

> Q:    Do you know anything of what happened when you walked out of the bedroom and she was standing there with the gun and you all started wrestling to the time you all ended up and you were on top of her at the front door? Do you remember-can you recall anything?
>
> A:    I remember we was wrestling around with the gun in the kitchen and then we hit the floor and then it was, like–I don't know. I ain't going to say– I guess I blacked out or something. I don't know. I don't remember.

*Id.*

In contrast, Mancha's statement goes all the way through the episode in detail—from hearing the planning of the robbery with Wendy and Ozzy, to entering the trailer and holding Cahue down, to the exit of the group and burning the gloves and sweater.  He recounted wrestling with Cahue, striking him with his fists, trying to hold him down, attempting to tie him up, trying to calm him down, details of wounds he received, Wendy's attack, punching him some more in the face and head, articles that were stolen, dragging Cahue into the bathroom, burning the sweater and gloves, *et cetera*.  Unlike Schroeder, Mancha acknowledged striking Cahue. Furthermore,  the evidence indicated Cahue was alive when the group left, and thus Mancha could not have known that he or Wendy or anyone else had killed Cahue.  While Mancha's statement included the self-serving or even rhetorical comment "I don't remember a lot[,]" that isolated sentence is belied by the extreme detail of the lengthy confession.  *See Enriquez*, 21 S.W.3d at 278.  Our situation is unlike *Schroeder* where a man struggles with his victim over a .357, and it somehow goes off at least three times, hitting the victim in the side two times and once in the back, and the defendant "blacked out or something."[4]

The State maintains there is no evidence that when Mancha was hitting Cahue he was behaving recklessly, and did not knowingly or intentionally cause Cahue's death.  The record shows otherwise.  A defendant's statement must be considered in the context of the entire record to determine whether there was evidence from which the jury could conclude

---

[4] As quoted above, *Schroeder* states that the defendant there was "completely incognizant" of what occurred in the shooting.  *Schroeder*, 123 S.W.3d at 401.

14

that a defendant was only guilty of manslaughter. *Wesbrook*, 29 S.W.3d 113-14; *Enriquez*, 21 S.W.3d at 278. The State seems to agree that members of the group only intended to rob Cahue, but that the struggle escalated, and at some unknown time Mancha changed his intent to murder. The argument that Mancha's intent changed is not established by the record. Rather, a pattern emerged showing that Cahue originally resisted the intruders and then lowered his resistance. This seems to have happened several times while Mancha insisted: "I kept holding onto the old man trying to calm him down." After Wendy kicked Cahue, Cahue began struggling again, so Mancha punched him some more in the face and head. According to this segment of Mancha's statement:

> I punched him some more in the face and head. I don't remember a lot. He was bleeding a lot from head and face. [sic] We grabbed him by his arms and dragged him to the back room. We just took off after that in the Jeep with the two gay guys. When I left the old boy was still breathing I did not think that he was going to die.

Jose testified the group went to rob Cahue. He saw Mancha and Alfredo holding Cahue down. The whole time–said here to be thirty minutes–Mancha was "holding him." Mancha did hit Cahue in the face with his hand more than once. Jose said he was afraid when they left Cahue was going to come out, fight and give chase, although Jose did not actually see him get up. None of the State's eye-witnesses' testimony supports the State's theory on appeal that Mancha at some point escalated his intent from what can be rationally viewed as reckless conduct to intentional homicide.

Contrary to the State's focus on a single sentence in Mancha's extensive statement, we are bound to consider all of the evidence presented by the State and the defendant in determining whether the trial court erred in failing to give a charge on the lesser-included offense. *Jones v. State*, 900 S.W.2d 103, 105 (Tex. App–Houston [14th Dist.] 1995, no

15

pet.).  In making this assessment, we are cognizant that if evidence from any source raises the issue of a lesser-included offense, a charge on that offense must be included in the court's charge if requested.  *Id.* (citing *Saunders v. State*, 840 S.W.2d at 391).  The determination of whether a defendant is entitled to a jury charge on a lesser-included offense must be made on a case-by-case basis according to the particular facts. *Livingston v. State*, 739 S.W.2d 311, 336 (Tex. Crim. App. 1987).  The credibility of the evidence and whether it conflicts with other evidence or is controverted may not be considered in determining whether an instruction on a lesser-included offense should be given.  *Banda v. State*, 890 S.W.2d 42, 60 (Tex. Crim. App. 1994).  Regardless of its strength or weakness, if any evidence raises the issue that the defendant was guilty only of the lesser offense, then the charge must be given.  *Saunders*, 840 S.W.2d at 391; *O'Brien v. State*, 89 S.W.3d 753, 755 (Tex. App.–Houston [1st Dist.] 2002, pet ref'd).

The State next cites *Bignall v. State*, 887 S.W.2d 21, 24 (Tex. Crim. App. 1994).  *Bignall* holds:

> The correct test, as stated in *Aguilar v. State*, 682 S.W.2d 556 (Tex. Crim. App. 1985), is as follows: "If a defendant either presents evidence that he committed no offense or presents no evidence, and there is no evidence otherwise showing he is guilty only of a lesser-included offense, then a charge on a lesser-included offense is not required." *Id.* at 558.

*Id.*  Unlike *Aguilar*, Mancha did not assert that no crime was committed.  And like *Bignall*, Mancha's statement, the circumstances surrounding the crime by the group of teens, and the State's own eyewitness testimony presented evidence of the lesser-included offense. *See id.* (holding that defendant is entitled to an instruction on a lesser-included offense if evidence from any source raises the issue).

Finally, the State argues from *Arnold*, 234 S.W.3d at 671-72 (that fragments of

16

testimony "cannot be plucked out of the record and examined in a vacuum.") *Arnold* held that any inference that the gun discharged accidentally was negated by appellant's testimony on cross-examination describing his state of mind. *Id.* On the stand, Arnold testified that he intentionally or knowingly fired the gun at the victim and that it was not an accident. He also stated:

> State: So, you shot him and you meant to do it, right?
>
> Appellant: Yes, sir.

*Id.* *Arnold* is very much akin to *Wesbook* and *Mathis* discussed above. Similarly, we conclude that the cited authority is not specifically applicable to this case.

The mental state must generally be inferred from the accused behavior and the circumstances but the acts relied upon as proving the mental state need not be the same act constituting the offense. George E. Dix & Robert O. Dawson, 41 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 20.171 (2d ed. 2001). The *mens rea* for manslaughter is recklessness. *Richie v. State*, 149 S.W.3d 856, 858 (Tex. App.–Amarillo 2004, no pet.). Because manslaughter is a result of conduct offense, the definition of the culpable mental state of recklessness is limited to the result of conduct. *Perez v. State*, 216 S.W.3d 855, 857 (Tex. App.–Corpus Christi 2006, pet. ref'd)(citing *Cook v. State*, 884 S.W.2d 485, 491 (Tex. Crim. App. 1994)). In *Richie*, the court explained:

> [A]nd, while, according to the statutory definition of reckless, one may be reckless regarding the circumstances surrounding his conduct or the result of his conduct, [TEX. PENAL CODE ANN.] § 6.03(c), the crime defined in § 19.04(a) simply encompasses recklessness *viz* the result of accused's conduct. In other words, the legislature, in defining manslaughter, was not concerned with whether the accused was aware of the circumstances surrounding his conduct but rather with whether his conduct resulted in death. *Id*. at 858 (emphasis added).

*Richie*, 149 S.W.3d at 858. Therefore, with regard to the offense of manslaughter, the

17

applicable part of section 6.03(c) should read: "A person acts recklessly, or is reckless, with respect to . . . the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the . . . result will occur." *Schroeder*, 123 S.W.3d at 400-01. For purposes of our analysis, we assume Cahue was killed as a result of Mancha's conduct.[5] Whether the charge is murder or manslaughter, the result is identical: Cahue died. There is no direct evidence that Mancha intentionally or knowingly killed Cahue.[6]

The circumstantial evidence, eyewitness testimony, and Mancha's stated intent to only restrain Cahue on the floor and specifically not to kill him, raised evidence of the lesser-included offense of manslaughter. Accordingly, the trial court erred in refusing the requested instruction on manslaughter.

The dissent states the distinction between a reckless mental state and an intentional or knowing one is irrelevant if the defendant was indicted for an offense for which he could be found guilty under section 19.02(b)(3) (felony murder). *See* TEX. PENAL CODE ANN. §19.02(b)(c). However, the dissent also states that the jury was not instructed under this section and therefore the court should apply the *Malik* test for evidentiary sufficiency, using a hypothetically correct charge *vis a vis* the jury charge actually given. *See Malik*, 953 S.W.2d at 240). We disagree.

---

[5] Other plausible causes of the resulting homicide, were the blows and kicks to the head and body by Wendy or others. During closing argument, defense counsel suggested that it was Ozzy and Jay, not Mancha, who had a motive to kill Cahue. Cahue knew Ozzy and Jay, but not Mancha. It was Ozzy and Jay who needed the money and set up the robbery. Cahue was moved from the place Mancha left him and apparently one or more persons returned and cleaned up the trailer with a mop that could not be found during the investigation. Counsel argued that was probably when Cahue was killed. While no DNA evidence was found on Mancha, blood was found on another accomplice's shoe. Multiple rib fractures found on Cahue were likely caused by kicks to Cahue's body by others, not from Mancha's blows to the head. The court's charge alternately included Wendy as the person who intentionally killed Cahue.

[6] We are not suggesting evidentiary insufficiency, nor was that issue raised.

18

First, no authority is cited for the extension of *Malik* into the question of whether or not a lesser included charge should be given. Even the State acknowledges that the second step in the lesser-included offense analysis is a question of fact and asks whether the evidence actually presented at trial supported giving the instruction to the jury. *See Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007) (holding a defendant is entitled to an instruction on a lesser-included offense where the proof for the offense charged includes the proof necessary to establish the lesser-included offense and there is some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser-included offense)[7].

Remarkably, the "hypothetically correct charge" was given to the jury. The jury was charged to find Capital Murder if: (1) Mancha intentionally caused the death of Cahue while committing or attempting to commit robbery; or (2) Wendy intentionally caused the death of Cahue by striking Cahue when Wendy was committing or attempting to commit robbery and Mancha knew of her intent, and encourage her; or (3) Mancha conspired with the group to commit robbery and Wendy intentionally caused the death of Cahue. The jury rejected the Capital Murder charge. Instead the jury found Mancha guilty of the lesser included

---

[7] Article 37.09 clearly delineates an offense is a lesser included offense if:

(1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

(2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4) it consists of an attempt to commit the offense charged or an otherwise included offense. TEX. CODE CRIM. P. ART. 37.09, Vernon's (2008).

The dissent does not address how it would comply with this article of the code of criminal procedure.

19

offense of Murder which was given in the charge as follows:

> "If you find from the evidence beyond a reasonable doubt that on or about AUGUST 6, 2008, in Hidalgo County, Texas, the Defendant, MICHAEL ANTHONY MANCHA, did intentionally or knowingly cause the death of MIGUEL CAHUE by stroking the victim with his hand or kicking the victim with his foot or striking the victim with an object unknown to the Gand Jurors, but you have a reasonable doubt as to whether the Defendant was then and there engaged in the commission of robbery of MIGUEL CAHUE at the time of the said striking with his hand or kicking with his foot or striking with an object unknown to the Grand Jurors, if any, then you will find the Defendant guilty of MURDER, but not CAPITAL MURDER.[8]

Finally, in its customary application, *Malik* may be utilized and due process not necessarily violated when affirming a conviction in which the jury charge contains "extra, unnecessary elements that are not supported by the evidence." *Id.* at 238. On the other hand, *Malik* recognized that due process prevents an appellate court from affirming a conviction based upon legal and factual grounds that were not submitted to the jury. *Id.* (citing *McCormick v. United States*, 500 U.S. 257, 269-70, 270 n. 8 (1991); *Dunn v. United States*, 442 U.S. 100, 106 (1979); *Cole v. Arkansas*, 333 U.S. 196, 201-02,(1948)). *Malik* is clearly inapplicable and its attempted application to this situation raises due process concerns. *See id.*

### V. Harm

The erroneous refusal to give a requested instruction on a lesser-included offense is charge error subject to an *Almanza* harm analysis. *Saunders*, 840 S.W.2d at 392; *see also Almanza,* 686 S.W.2d at 171. Reversal is required if the error resulted in some harm to the accused, "some" meaning "any." *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim.

---

[8] A similar murder charge was given with Wendy as the principal actor.

20

App. 1986); *Almanza*, 686 S.W.2d at 171. When the absence of the lesser-included offense instruction leaves the jury with the sole option either to convict the defendant of the charged offense or to acquit him, a finding of harm is essentially automatic because the jury was denied the opportunity to convict the defendant of the lesser offense. *Saunders v. State*, 913 S.W.2d 564, 571 (Tex. Crim. App. 1995). Such is the case here. There is a distinct possibility that the jury, believing the defendant committed homicide, but given only the option to convict him of the greater offense of murder, chose to find him guilty of that greater offense rather than to acquit him of any homicide, even though it had a reasonable doubt that he really committed the greater offense.[9] *Id.* (citing *Beck v. Alabama*, 447 U.S. 625, 634, (1980)). Just as the jury rejected the State's charge of capital murder in favor of the lesser-included murder finding, the jury could reasonably have found the death of Cahue was recklessly caused. Accordingly, we hold that under this record, Mancha suffered some harm from the erroneous refusal to submit the lesser-included charge of manslaughter.

## VI. Conclusion

We reverse and remand for a new trial on all issues.

DON WITTIG
Justice

Dissenting Memorandum Opinion
by Justice Gina M. Benavides.
Do not publish.
TEX. R. APP. P. 47.2(b).
Delivered and filed the
14th day of April, 2011.

---

[9] Like the holding in *Jackson*, the lesser charged offense of aggravated assault was not a viable option to the jury, given that homicide was the result of the crime. *See Jackson*, 992 S.W.2d at 475.

21